[No. C064077. Third Dist. Nov. 8, 2011.]

In re the Marriage of JEFFREY D. and PATRICIA L. SEATON.
JEFFREY D. SEATON, Respondent, v.
PATRICIA L. SEATON, Appellant.

## Counsel

Bair & Bair and Pamela A. Bair for Appellant.

Jeffrey D. Seaton, in pro. per., for Respondent.

## Opinion

**MAURO, J.**—California law provides, with limited exceptions, that an individual can only be married to one person at a time. (Fam. Code, § 2201.)[1] A bigamous marriage is void from the beginning. (*Ibid.*)

This case calls on us to determine whether Nevada law is the same as California law in this regard. We conclude that under both Nevada and California law, a bigamous marriage is void from its inception, even if it has not been declared void by a court.

---

[1] Undesignated statutory references are to the Family Code.

Patricia L. Seaton appeals from a judgment nullifying her marriage with Jeffrey D. Seaton.[2] The marriage was nullified under section 2201 on the ground that Patricia was married to another man, Henry Marquez, when she purportedly married Jeffrey. The trial court also determined that Patricia was not a putative spouse under section 2251 because she did not believe in good faith that her marriage to Jeffrey was valid.

Patricia contends on appeal that (1) her marriage to Jeffrey should not have been nullified because her prior marriage to Henry was void under Nevada law due to her preexisting marriage with Richard LaForm; (2) the trial court erred in denying her putative spouse claim, because Jeffrey believed in good faith that his marriage to Patricia was valid; and (3) there was no substantial evidence to support the trial court's finding that Patricia knew about an unfiled summons and petition for nullity of her marriage with Henry.

Patricia and Jeffrey's marriage should not have been nullified, because Patricia's prior marriage to Henry was void. As a result, it is not necessary to reach Patricia's other contentions. We will reverse the judgment.

## BACKGROUND

Patricia married Richard in November 1973. After separating from Richard in January 1987, she dated Henry for several months. Patricia met Jeffrey in January 1988 and broke up with Henry in February 1988.

Patricia was a legal secretary and Jeffrey was a law student intern. Jeffrey was also married. He married Debra Meyer in January 1970. By March 1988, Jeffrey had separated from Meyer in order to pursue a relationship with Patricia.

Henry continued to send Patricia gifts and repeatedly came to her home and place of work. Patricia told Jeffrey about Henry's activities and asked Jeffrey to help her get a restraining order against Henry. Such an order was obtained in May 1988. Ten days later, Patricia drove to Nevada and married Henry, falsely stating in her marriage license application that her marriage to Richard had ended in April 1988.

According to Patricia's version of the elopement, when Henry was served with the restraining order, he called Patricia and threatened to come to her house, saying: "By the time I get there, you would probably call the cops, but I can take care of you before then." Rather than endanger her children, who were home at the time, Patricia agreed to meet with Henry. She brought her

---

[2] We will refer to the parties by their first names for clarity.

sister to the meeting. When they arrived, Henry "became very nice" and asked to take Patricia to dinner in Reno to talk about their relationship. Patricia agreed because, as she explained, Henry was "very good at talking." Patricia and Henry also brought Patricia's sister to Reno. They arrived in Reno in the early afternoon, ate at a buffet, and began drinking. Several shots of tequila later, they ended up at a wedding chapel where Patricia and Henry were married.

After spending the night in a hotel, they drove back to Sacramento early the next morning, Memorial Day. According to Patricia, when she got home, she immediately called several family law attorneys in Nevada. Despite the holiday, she managed to reach an attorney who advised her after a 40-minute conversation that there was no need to get an annulment because the marriage to Henry was void since she was already married to Richard. The attorney also advised her to "double-check" to make sure he was correct about the law. Patricia said that when she told Jeffrey about the elopement approximately one week later, they went to the law library at McGeorge School of Law to verify the legal advice she received from the Nevada attorney. Jeffrey confirmed that the marriage to Henry was void and that no further action was required. Patricia accepted Jeffrey's advice and did not consult any other attorneys concerning the matter.

Jeffrey denied researching the validity of Patricia's marriage to Henry at that time. According to Jeffrey, he did not discover that Patricia had married Henry until sometime in 1989 when he found a wedding picture. He told her it "need[ed] to be annulled or taken care of." When he offered to help Patricia find an attorney in Nevada to obtain an annulment, she declined, stating that she would take care of it herself. Later, Patricia told Jeffrey that she had done so. Jeffrey trusted that Patricia was telling the truth.

Patricia's marriage to Richard was dissolved in December 1988. Her marriage to Henry was never dissolved or annulled. Jeffrey's marriage to Meyer was dissolved in April 1991. Patricia and Jeffrey were married in June 1991.

In November 2008, Jeffrey filed a petition for legal separation. Patricia responded with a request for dissolution. Over Patricia's opposition, Jeffrey was allowed to amend the petition to request a judgment of nullity based on Patricia's former marriage to Henry. As Jeffrey explained, after filing the initial separation petition, he searched for a judgment dissolving or nullifying the marriage with Henry but found none. However, while looking through a file cabinet containing Patricia's family law file, Jeffrey did find a draft summons and petition for nullity. Both documents named Dirk R. Amara of the Amara & Keller Law Office as Patricia's attorney and appeared to have

been prepared sometime in 1991. The documents were never filed. Both Patricia and Jeffrey denied any involvement in their preparation. Amara testified that the documents appeared to have been prepared by his office, but he did not recognize either Jeffrey or Patricia.

A two-day court trial was held in September 2009. The trial court nullified the marriage on the ground that Patricia was married to Henry when she attempted to marry Jeffrey. Applying Nevada law to the validity of the marriage with Henry, the trial court ruled that although the marriage was void because of Patricia's prior marriage to Richard, an annulment proceeding was still required to legally sever their relationship. Thus, because Patricia's marital relationship with Henry had not been severed when she purportedly married Jeffrey, her subsequent marriage to Jeffrey was void. The trial court also determined that it could not declare the marriage with Henry void because it lacked personal jurisdiction over Henry.

The trial court further ruled that Patricia was not a putative spouse because she did not believe in good faith that her marriage to Jeffrey was valid. The trial court found Patricia's story to be "objectively incredible," and placed particular emphasis on the fact that a summons and petition for nullity were prepared in 1991, "indicat[ing] that someone knew that the [Henry] marriage had to be addressed." As the trial court explained, "if [Jeffrey] procured the preparation of the documents in 1991, that fact contradicts [Patricia's] testimony that she and [Jeffrey] researched the marriage validity issue in 1989 and concluded that the marriage was void. . . . [¶] If, on the other hand, [Patricia] had Mr. Amara prepare the Summons and Petition in 1991, her argument that she relied on both the Nevada attorney's and [Jeffrey's] advice is blown. If she in fact was given that advice, and relied on the same, then there would be no need to have Mr. Amara prepare the Summons and Petition. Either way, the existence of these documents in [Patricia's] legal file are damning to her assertions."

The trial court also relied on the fact that, at the time Patricia married Henry, she was represented by a family law attorney who was handling her divorce from Richard. But rather than seek his advice, she purportedly called a Nevada attorney on Memorial Day who "discuss[ed] a significant legal issue for 40 minutes, offer[ed] legal advice, and then end[ed] the call with the admonition that [Patricia] should 'double-check' his advice 'to make sure that he was accurate.' " The trial court found this to be "difficult to believe," but explained that even if the phone call did occur, such advice "is inherently unreliable." Nor did the trial court believe that Jeffrey researched the issue at McGeorge School of Law. The trial court also pointed out that Patricia's credibility was damaged by the fact that she lied on her marriage license application in order to marry Henry, and that neither Patricia's signature on

the marriage certificate nor that of her sister appeared to be the signature of an extremely intoxicated person, contradicting her assertion that she and her sister were heavily intoxicated at the time of the marriage.

## STANDARD OF REVIEW

Ordinarily, review of a judgment of nullity is under the substantial evidence standard. (*Patillo v. Norris* (1976) 65 Cal.App.3d 209, 216 [135 Cal.Rptr. 210].) Here, however, the relevant facts are undisputed, and the application of California and Nevada law to these facts presents a pure question of law subject to de novo review. (See *Miller v. Ellis* (2002) 103 Cal.App.4th 373, 378 [126 Cal.Rptr.2d 667].)

## DISCUSSION

### I

Patricia contends her marriage to Henry was void even in the absence of an annulment decree, and thus her marriage to Jeffrey was valid. We agree.

We begin our discussion with an overview of the California law pertaining to a judgment of nullity based on a void or voidable marriage. There is a fundamental difference between a judgment of dissolution and a judgment of nullity. While a judgment of dissolution terminates a valid marriage, a judgment of nullity declares that the marriage was void from its inception. (*Sefton v. Sefton* (1955) 45 Cal.2d 872, 874 [291 P.2d 439] (*Sefton*); § 2212, subd. (a) [judgment of nullity restores the parties to the status of unmarried persons].)

Generally, a bigamous marriage is "illegal and void from the beginning" where the former marriage has not been "dissolved or adjudged a nullity before the date of the subsequent marriage." (§ 2201, subd. (a)(1).) However, where "[t]he former husband or wife (i) is absent, and not known to the person [contracting the subsequent marriage] to be living for the period of five successive years immediately preceding the subsequent marriage, or (ii) is generally reputed or believed by the person to be dead at the time the subsequent marriage was contracted," the subsequent marriage is merely voidable. (§ 2201, subds. (a)(2) & (b).)

In California, a void marriage is invalid for all purposes from the moment of its inception, whether or not it has been so declared in a court of law, and its invalidity may be shown collaterally in any proceeding in which the fact of marriage may be material. (*Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1114 [17 Cal.Rptr.3d 225, 95 P.3d 459],

citing *Estate of Gregorson* (1911) 160 Cal. 21, 26 [116 P. 60]; see also *Estate of Karau* (1938) 26 Cal.App.2d 606, 607 [80 P.2d 108].) On the other hand, a voidable marriage is valid for all purposes until it is judicially declared a nullity, and may only be challenged by a party entitled by statute to assert its voidability. (*Estate of Gregorson, supra,* 160 Cal. at pp. 26–27.) "If the parties who are alone recognized by the statutes as entitled to have the marriage annulled do not, during its existence, see fit to avoid it, a stranger to the marriage should not be permitted to question its validity in a collateral proceeding." (*Ibid.*) However, even in the case of a voidable marriage, a judgment of nullity declares that "no valid marriage ever existed." (*Millar v. Millar* (1917) 175 Cal. 797, 807 [167 P. 394].)

Thus, a judgment of nullity "has been said to 'relate back' and erase the marriage and all its implications from the outset." (*Sefton, supra,* 45 Cal.2d at p. 874.) At the same time, this "legal fiction" was fashioned by the courts to do substantial justice as between the parties to a void or voidable marriage, and is desirable only "when used as a device for achieving that purpose." (*Id.* at p. 875; see also *Berkely v. Berkely* (1969) 269 Cal.App.2d 872, 873 [75 Cal.Rptr. 294].) "[I]n cases involving the rights of third parties, courts have been especially wary lest the logical appeal of the fiction should obscure fundamental problems and lead to unjust or ill-advised results respecting a third party's rights." (*Sefton, supra,* 45 Cal.2d at p. 875.)

In addition to the foregoing, this case also requires us to consider Nevada law pertaining to void or voidable marriages. This is so because Jeffrey sought nullification of his marriage to Patricia based on the assertion that the marriage was void because Patricia's "former marriage" to Henry had not been "dissolved or adjudged a nullity before the date of the subsequent marriage." (§ 2201, subd. (a)(1).) Patricia does not dispute that she married Henry in Nevada prior to marrying Jeffrey in California. And there is no dispute that the marriage to Henry was neither dissolved nor adjudged a nullity. Thus, the question of whether Patricia's marriage to Jeffrey was void turns on whether she was married to Henry when she married Jeffrey. In answering this question we must apply Nevada law. (§ 308, subd. (a); *Colbert v. Colbert* (1946) 28 Cal.2d 276, 280 [169 P.2d 633] [discussing Civ. Code, former § 63; now Fam. Code, § 308].)

The relevant Nevada statute provides that a marriage is "void without any decree of divorce or annulment or other legal proceedings" when either party has a "former husband or wife then living." (Nev. Rev. Stat., § 125.290.) Notwithstanding this unambiguous language consistent with California law, in *Williams v. Williams* (2004) 120 Nev. 559, 564 [97 P.3d 1124] (*Williams*), the Nevada Supreme Court stated that although a bigamous marriage is void under this provision, an annulment proceeding is nevertheless required to

legally sever the marital relationship. (*Williams, supra*, 97 P.3d at p. 1127.) The trial court in this case relied on *Williams* and declared Patricia's marriage to Jeffrey a nullity because she had not severed her marital relationship with Henry at the time she married Jeffrey. Patricia urges us to disregard the Nevada Supreme Court's statement in *Williams* as dicta, and apply the plain meaning of the Nevada bigamy statute, i.e., that her marriage to Henry was void without an annulment decree.

■ We agree with Patricia that the relevant statement in *Williams* is dicta. While *Williams* involved a bigamous marriage, neither party disputed that the marriage was void. The dispute on appeal was whether the would-be wife was entitled to half of the parties' joint property as a putative spouse, and if so, whether she was also entitled to spousal support. (*Williams, supra*, 97 P.3d at p. 1127.) The Nevada Supreme Court adopted the putative spouse doctrine as a rule of Nevada marital law, held that substantial evidence supported the trial court's finding of putative spouse status, and also held that the trial court correctly divided the parties' joint property as quasi-community property but erred in awarding spousal support. (*Id.* at pp. 1128–1130, 1131.) However, at the start of the analysis, the Nevada Supreme Court stated: "Although their marriage was void, an annulment proceeding was necessary to legally sever their relationship. An annulment proceeding is the proper manner to dissolve a void marriage and resolve other issues arising from the dissolution of the relationship." (*Id.* at p. 1127, fn. omitted.) Because this statement was unnecessary to the determination of the questions involved in the case, it is dicta and not controlling. (*St. James Village, Inc. v. Cunningham* (2009) 125 Nev. ___, ___ [210 P.3d 190, 193]; *Kaldi v. Farmers Ins. Exchange* (2001) 117 Nev. 273, 282 [21 P.3d 16].)

■ We also agree with Patricia's assertion that the trial court in this case could have declared the marriage with Henry void without acquiring personal jurisdiction over Henry. In Nevada, as in California, a bigamous marriage is void, not merely voidable at the option of one of the parties to the marriage. (*McClintock v. McClintock* (2006) 122 Nev. 842, 845 [138 P.3d 513].) And the invalidity of a void marriage may be shown collaterally in any proceeding in which the fact of marriage may be material. (*Lockyer v. City and County of San Francisco, supra*, 33 Cal.4th at p. 1114; see also *Estate of Karau, supra*, 26 Cal.App.2d at p. 607.) Because the fact of the marriage with Henry is material to the validity of the marriage between Patricia and Jeffrey, the trial court could have declared the marriage with Henry void in this collateral proceeding. There being no dispute that Patricia was still married to Richard when she married Henry, her marriage to Henry was "void without any decree of divorce or annulment or other legal proceedings." (Nev. Rev. Stat. § 125.290.)

Nonetheless, our conclusion that Patricia's marriage to Henry was void does not end our analysis. We must next determine whether, under the particular facts of this case, Patricia may assert the invalidity of her marriage with Henry in an effort to defeat Jeffrey's request for nullity of his marriage to Patricia.

■ In general, both in Nevada and in California, the idea that a void marriage never existed is a legal fiction that should be used only where it promotes substantial justice between the parties to the void marriage, and not where the rights of third parties are involved. (*Sefton, supra*, 45 Cal.2d at pp. 875–876; *Shank v. Shank* (1984) 100 Nev. 695, 697 [691 P.2d 872] (*Shank*) [citing *Sefton* with approval].) For example, where a valid marriage ends with a judgment of dissolution requiring one of the spouses to pay alimony to the other spouse until remarriage, a subsequent bigamous marriage operates to cut off the alimony obligation. This is so regardless of the fact that the bigamous marriage was void from inception, and therefore never existed with respect to the parties to the purported marriage. (*Shank, supra*, 691 P.2d at p. 873.) In such cases, the right of the previous spouse to assume "that his [or her] obligation to pay alimony had ceased" and "recommit his [or her] assets previously chargeable to alimony to other purposes" trumps the legal fiction that the bigamous marriage never happened. (*Sefton, supra*, 45 Cal.2d at pp. 876–877; see *Berkely v. Berkely, supra*, 269 Cal.App.2d at p. 873.)

Similarly, the legal fiction that a void marriage never existed has been abandoned where the rights of children are involved. Thus, children born during a bigamous marriage are considered legitimate even though the marriage was void from inception. (*Glass v. Glass* (Mo.Ct.App. 1977) 546 S.W.2d 738, 740, fn. 1, cited with approval in *Shank, supra*, 691 P.2d at p. 873; *Sefton, supra*, 45 Cal.2d at pp. 875–876; *Adoption of Jason R.* (1979) 88 Cal.App.3d 11, 16 [151 Cal.Rptr. 501].)

Patricia's marriage to Henry was void from the beginning without the need for an annulment proceeding. As between them, the marriage never existed. But whether Patricia can assert the invalidity of her marriage to Henry against Jeffrey is a different matter. The trial court found that Patricia was not credible and that she misrepresented the facts on more than one occasion. She arguably should not benefit from her deception. Nonetheless, our conclusion in this case—that Patricia's marriage to Henry did not exist when she married Jeffrey—is consistent with Patricia's representation to Jeffrey and consistent with Jeffrey's belief throughout his marriage to Patricia. For more than 17 years, Jeffrey believed his marriage with Patricia was valid and he wanted his marriage with Patricia to be valid. Although we do not condone Patricia's conduct, controlling law compels the conclusion that her marriage to Jeffrey was valid.

We will reverse the judgment nullifying Patricia's marriage with Jeffrey.

## II

Patricia also contends that the trial court erred in denying her putative spouse claim because Jeffrey believed in good faith that the marriage was valid, and that there is no substantial evidence to support the trial court's finding that she knew about the unfiled summons and petition for nullity of her marriage with Henry. But because we conclude that the marriage between Patricia and Jeffrey should not have been nullified, it is unnecessary to reach Patricia's additional contentions.

## DISPOSITION

The judgment of nullity is reversed. Patricia shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Hull, Acting P. J., and Butz, J., concurred.